## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **JONATHAN SWARTZ, et al.,** | |
| **Plaintiff,** | |
| **vs.** | **Case No. 12-cv-01029-DDC-KGG** |
| **DJ ENGINEERING, INC., and REZAUL CHOWDHURY** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs bring this lawsuit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, against defendants DJ Engineering ("DJE") and its Chief Executive Officer, Rezaul Chowdhury (Doc. 1). Plaintiffs, who are former employees of DJE, have alleged that defendants improperly classified them as salaried employees exempt from the FLSA's overtime-pay requirements. This case comes before the Court on defendants' Motion for Summary Judgment (Doc. 82) and Motion to Decertify Collective Action (Doc. 84). Plaintiffs have filed responses to both motions (Docs. 102, 105), and defendants have filed replies (Docs. 117, 120) and a supplement to their summary judgment reply (Doc. 121). For the reasons explained below, the Court grants in part and denies in part defendants' Motion to Decertify Collective Action and grants in part and denies in part defendants' Motion for Summary Judgment.

### I.   Procedural Background

Jonathan Swartz, the original named plaintiff in this lawsuit, filed a Complaint on January 17, 2012 (Doc. 1). He sought to represent himself and "all similarly situated current and former employees." Doc. 1 at ¶ 2. On September 24, 2014, the Court granted Mr. Swartz' motion to certify this lawsuit as a collective action conditionally under 29 U.S.C. § 216(b) (Doc.

1

45).  Specifically, the Court conditionally certified the following classes of employees:  (1) all employees whom defendants deemed exempt as administrative, executive or professional employees, who worked more than forty hours in any workweek and who worked at DJE at any time from January 19, 2010, through January 21, 2013 (the "Deduction Class"); and (2) all engineers who worked in the Engineering Department whom the defendants deemed to be exempt professional employees, who worked more than forty hours in any workweek between January 19, 2010, and January 21, 2013 (the "Engineer Class").  *Id.*  Under the Court's Order, the parties met and agreed upon a "Notice and Consent" form to send to the putative class (Doc. 48).  Seven employees have since opted into this lawsuit.  The parties represent that they have now completed "significant discovery" in this case.

## II.   Facts

The facts material to defendants' motion for summary judgment are set forth below.  The Court did not need to resolve any controverted facts to rule defendants' motion to decertify.[1]  Where controverted facts mattered to the outcome of defendants' motion for summary judgment, the Court resolved them in the light most favorable to plaintiff, the non-moving party.

### A.  Defendants

DJE is a manufacturing company located in Augusta, Kansas.  The company manufactures parts for commercial, military, and general aviation aircrafts, including:  flight-critical sheet metal assemblies; advanced composite and metallic bonded assemblies; hydraulic components; mechanical actuators; gearboxes; landing gear; and propellers.  DJE serves

---

[1]For this reason, the Court denies plaintiffs' request for an evidentiary hearing on the motion to decertify.  *See Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 818 (10th Cir. 2008) (holding that when issues raised by the defendants' motions can "be addressed adequately in the form of written briefs and supporting documents," a formal hearing is not necessary) (citing *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir. 1988)).

2

customers located around the world.  Because it needs its employees to be available and

responsive to customer needs, DJE requires its salaried employees to work 50-hour workweeks.

As of November 1, 2012, DJE employed approximately 235 employees at the Augusta, Kansas

facility.

### B.  Plaintiffs

There are eight plaintiffs in this lawsuit.  Mr. Swartz is the class representative for both

conditionally-certified classes.  The remaining plaintiffs opted into this case following the

Court's Order granting conditional certification.

#### 1.  *Jonathan Swartz*

Mr. Swartz worked at DJE as a Project Engineer from August 2008 to December 2011.

He earned a degree in mechanical engineering and worked in the aircraft industry before and

after his term of employment at DJE.  He is proficient in the use of ENOVIA, a software

program that DJE uses to design complex engineering processes.  While working at DJE, he

devoted most of his time to engineering tasks associated with coordinating production resources

during the manufacturing process.  Specifically, his job required him to review specifications for

parts that a customer wanted to purchase, procure all materials necessary for the job, and

formulate a production plan.  Sometimes, a project required Mr. Swartz to use a software

program called CATIA[2] to create a model of the requested part.  If the job required DJE to build

a specific tool for the manufacturing process, Mr. Swartz normally would design that tool.

Early in his employment, Mr. Swartz claims he formed the belief that an hourly employee

with no engineering training could perform his job, so DJE misclassified him as an FLSA

exempt professional employee.  He also contends that DJE improperly reduced his salary due to

---

[2] CATIA is the acronym for Computer Aided Three-Dimensional Interactive Application.  It is a
software package that engineers use to design, simulate, analyze, and manufacture products in a variety of
industries, including the aerospace industry.

absence that lasted less than a full workday, rendering him an hourly-compensated employee.

### 2. *Ramin Ranjbar*

Opt-in plaintiff Ramin Ranjbar worked at DJE from June 14, 2010, to July 6, 2012. A degreed engineer, Mr. Ranjbar is proficient at using CATIA and AutoCAD, another software systems used by DJE's engineers. He also has received training to use PATRAN, a program for analyzing structural design, and PAM-RTM, software that simulates resin movement in composite structures. When he began his employment at DJE, Mr. Ranjbar was classified as a Quality Engineer, and DJE paid him a starting salary of $60,000 per year. Initially, his primary job duty consisted of checking manufactured products to ensure that they complied with customer specifications.

In 2011, Mr. Ranjbar went to his supervisor, Ryan Hernandez, and informed him that he was unsatisfied with his current work assignments. Mr. Hernandez asked the Engineering Department to take on Mr. Ranjbar. Within a few weeks, DJE reclassified Mr. Ranjbar as a Project Engineer. In addition to the inspection duties he had performed previously, Mr. Ranjbar participated in project management and manufacturing engineering. DJE management requested that Mr. Ranjbar continue to assist with inspection duties while the company searched for a new hire to take over Mr. Ranjbar's previous job. Frustrated with his continued inspection duties, Mr. Ranjbar informed the Engineering Manager, Mike Lydon, that he wanted more engineering projects. Mr. Lydon advised him that he intended to give him more engineering projects when the shop's workload increased. Mr. Ranjbar voluntarily ended his employment with DJE on July 6, 2012, to take a job in California.

Mr. Ranjbar has joined both of the conditionally-certified classes. He contends that DJE, on occasion, unlawfully reduced his salary. He also asserts that, during the last twelve months of

his employment, he spent forty percent of his time on project management and sixty percent on

inspection duties.  He thus believes that DJE misclassified him as an FLSA exempt professional

employee and should have paid him overtime wages.

### 3.  *Vien Nguyen*

Opt-in plaintiff Vien Nguyen is also a degreed engineer.  He worked at DJE as a

Project Engineer from June 2011 to August 2012 under the supervision of Mike Lydon.  Mr.

Nguyen is certified in CATIA V4 and V5.  Mr. Nguyen's job required him to review customer

submissions.  The customer—typically an aircraft manufacturer—would provide specifications

for a part or component that it wanted DJE to manufacture.  Mr. Nguyen then would scale the

customer's specifications in CATIA and pass that information to the shop for manufacturing.

Mr. Nguyen also was responsible for determining when the manufacturing process would require

the materials, whether the materials were available, and whether the process could utilize a

different material while still conforming to the customer's specifications.  Mr. Nguyen has joined

the Deduction Class.  He alleges that DJE, on occasion, improperly reduced his salary for partial

day absences.

### 4.  *David McDonald*

Opt-in plaintiff David McDonald was employed by DJE as the Accountable Manager of a

Repair Station that DJE acquired in the Spring of 2009.  The Federal Aviation Administration

("FAA") defines an Accountable Manager as the individual designated by the certified repair

station as responsible for all Repair Station operations, including ensuring that Repair Station

personnel follow all applicable regulations.  *See* 14 C.F.R. § 145.3.  The Accountable Manager

also serves as a company's primary contact with the FAA.  *Id.*  Mr. McDonald prepared the

forms necessary to obtain FAA approval of the Repair Station, authored the operations manuals

used in the Repair Station, designed its layout, and marketed the services of the new Repair Station to customers and prospective customers.

Once the Repair Station was operational, Mr. McDonald's duties included:  coordinating repairs to aircraft components with the FAA; approving work completed by the Repair Station; handling FAA information requests; determining the Repair Station's capabilities for work on various aircraft components; updating the capabilities list for the Repair Station; updating the operations manuals; and supervising the Repair Station's employees.  Although Mr. McDonald lacked the ultimate authority to hire or fire Repair Station employees, Mr. McDonald evaluated their performance, assigned their daily work, and trained them.  He also advised Mr. Chowdhury about staffing needs at the Repair Station and participated in the interviewing and hiring processes for new employees.  In 2013, DJE purchased a composites shop located in Canada. DJE put Mr. McDonald in charge of the repair station at the Canadian composites shop.  Mr. McDonald has opted into the Deduction Class.  He contends that DJE, on occasion, improperly reduced his salary for certain absences.

### 5.  *Claude Riggins*

Opt-in plaintiff Claude Riggins began his employment with DJE in January of 2008. DJE classified him as the Marketing Manager.  Throughout his employment at DJE, he was the highest-ranking employee in the Sales and Marketing Department.  His job required him to make sales calls to customers and prospective customers, manage the quote submission process, and supervise several subordinate employees.  On about half of his customer visits, Mr. Riggins would take along other employees, including David Hall and David McDonald.  If a customer hired DJE for the work, Mr. Riggins was responsible for resolving any problems that arose during the course of the business relationship.  Mr. Riggins has joined the Deduction Class.

Although he has not identified any occasions that DJE improperly reduced his salary for partial day absences, he nevertheless asserts that he was subject to a policy permitting such reductions.

### 6. *David Hall*

Opt-in plaintiff David Hall worked at DJE from May 2009 to November 2010.  He holds a degree in industrial engineering.  By the time he applied for a position at DJE, Mr. Hall had accumulated twenty-six years of experience as an aircraft structural design engineer.  He is proficient in CATIA El Fini, a software program DJE used to analyze loads on different aeronautical structures.  To execute his sales and marketing duties, Mr. Hall would contact the procurement personnel he knew from his prior attempts to sell DJE services.  DJE gave Mr. Hall, along with Mr. Riggins, discretion to plan and execute their marketing and sales strategies.  They picked potential customers, identified customers' needs, planned sales pitches, and made customer visits.  Mr. Hall has joined the Deduction Class.  He contends that DJE, on occasion, improperly reduced his salary for certain absences.

### 7. *Mike Clift*

Opt-in plaintiff Mike Clift began working at DJE in 2009.  Before joining DJE, Mr. Clift was a general manager at Boeing, where he had acquired expertize in "lean" manufacturing techniques.  Mr. Clift worked under the supervision of Mr. Lydon in the Engineering Department.  DJE assigned Mr. Clift the task of resolving issues that DJE experienced while manufacturing doors for Air Force planes.  Mr. Lydon also assigned Mr. Clift responsibility for reviewing manufacturing processes, adjusting staffing, and improving tool design.  DJE was impressed with Mr. Clift's work revamping the door manufacturing process, and the company asked him to work with Ray Tuschhoff, DJE's vice president, to implement lean manufacturing processes across the company.  Mr. Clift continued to work in this capacity until his employment

with DJE ended in December 2010.  Mr. Clift has opted into the Deduction Class.  He also

asserts that DJE improperly reduced his salary payments for absences of less than a full day.

### 8.  *Saeed Mansouri*

Opt-in plaintiff Saeed Mansouri has an engineering degree and has worked at DJE three

separate times since 1994.  In 2009, DJE hired him as its Composites Manager to help the

company develop a composites shop.  After the company's efforts to develop a composites shop

proved unsuccessful, DJE purchased a Canadian composites shop and put Mr. Mansouri in

charge of it.  In that role, he traveled to and from Canada several times over a sixth-month

period.  He ensured that the shop employed adequate staff and that the products it made met all

applicable standards.  DJE also assigned him miscellaneous special projects as needed, including

a four-month assignment as interim Quality Manager.  In this role, he supervised about fifteen

employees.  He also was involved in sales activities, including responding to customer requests

for quotes.  Mr. Mansouri has joined the Deduction Class.  He admits that DJE never improperly

deducted salary payments but contends that he was subject to a policy permitting such

deductions.

### C.  DJE's Compensation Practices

Plaintiffs assert the following facts in support of their allegation that DJE treated its

purportedly salaried employees as hourly-compensated employees.  The company maintained

two shifts for its salaried employees.  The first shift began at 6:00 a.m. and ended at 4:30 p.m.;

the second began at 7:00 a.m. and ended at 5:30 p.m.  DJE required its salaried employees to

work 50 hours per week and 100 hours during each two-week pay period.  It also required them

to work a full 10-hour shift unless the employee took paid or unpaid leave.  Thus, employees

routinely came to work before their shift began if they were going to miss time later in the day or

stayed after their shift ended if they missed time earlier in the day.  When it was not possible to make up lost time during one day, the employee would make up the time during other days in the workweek.

DJE also required its salaried employees to clock in when they arrived for work and clock out when they left.  This policy required salaried employees to clock out if they left the company's premises for their lunch break.  DJE did not punish employees who failed to clock in or out, but human resources would make a notation on their time records.  This rule applied when an employee left company's premises for non-company business but not if the employee left for company-related business.  If, for example, a salaried employee left the premises to see a customer, DJE would not require the employee to account for the time the employee spent away from the facility.  The time sheets did not record as time worked any period when the employee was absent, whether for lunch, a doctor's appointment, or any other short absence.  According to Mr. Chowdhury, the time-keeping requirement exists both to help the company determine whether employees are on company premises in the event of an emergency and to create records of project costs.

In their response to defendants' motion, plaintiffs have submitted what they characterize as "representative" time sheets.  *See* Pl.'s Ex. 14 (Doc. 102-16).  These time sheets show a record of when a salaried employee clocked in or out, their automatic 30-minute lunchtime deductions (and any additional time taken for lunch), and their total hours worked (for each day and for the two-week pay period).  Until sometime in mid-to-late 2012, the time reports included a notation showing the total hours that DJE paid a salaried employee for that particular pay period.  The time sheets also contain notations showing when an employee received vacation or holiday pay.  Often, the notation in the upper right corner of the time sheet also showed the percentage of

salaried pay that the employee received (*e.g.*, 90% or 70%) based upon the amount of unpaid leave the employee took during the pay period.

In most cases, DJE did not impose a deduction even though the employee had taken unpaid leave because the employee would make up the missed time, doing so on the same day or at some other time during the pay period.  DJE did not have an employee handbook, a supervisor or manager's manual, a written pay plan, or any statement about when DJE would deduct money from an employee's salary.  Mr. Chowdhury and Vice President Raymond Tuschhoff believed that it was lawful to make salary deductions for absences of less than a day until their counsel corrected them sometime around September 2012.

After Mr. Swartz filed this lawsuit, DJE conducted a payroll review to determine whether it had reduced the salary of any salaried employee for an absence of less than a full day.  DJE determined that they had made improper deductions from the salaries of 13 exempt employees. The company issued reimbursement checks to 12 of the employees, in an amount totaling $2,440.10.  On the advice of counsel, however, the company did not issue a check to Mr. Swartz.

In November 2012, the DJE revised its Paid Time Off ("PTO") policy as applied to salaried employees.  This revision provides, "PTO will NOT be used in hourly increments due to the fact that salary employees do not track hours.  PTO will be used in full day increments only." Pl.'s Ex. 17 (Doc. 102-19).  In the notice of the revision that DJE sent to salaried employees, management advised that "[w]e have reviewed the PTO used by salary employees during the past year and there have been some instances when PTO was used incorrectly."  *Id.*  This notice also indicated that DJE would review its compensation records and reimburse employees from whom it improperly had deducted salary payments.  But even after November 2012, DJE continued keeping track of salaried employees' work hours, just as it had before it revised the

PTO policy.  Pl.'s Ex. 18 (Doc. 102-20).  After the revised policy, however, the timesheets'

notations about percentage of salary due was replaced by the word "Salary."

### III.    Defendants' Motion to Decertify the Collective Action

As the Court discussed in its Order granting conditional certification, the Tenth Circuit

has approved a two-stage *ad hoc* analysis for determining whether employees are "similarly

situated" under § 216(b).  *See* Doc. 45 at 2-3 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267

F.3d 1095, 1102-03 (10th Cir. 2001) (applying the two-stage analysis to ADEA claim but noting

the statute's collective action procedure "expressly borrows the opt-in class action mechanism of

the Fair Labor Standards Act")).  The Court discharged the first stage of this analysis when it

concluded that the putative members of the collective action were "similarly situated" for

purposes of giving them notice and an opportunity to opt in as plaintiffs.  *See id.* at 9-14.

After the close of discovery, the Court conducts the second stage of the *ad hoc* analysis,

typically when a defendant files a motion to decertify the collective action.  *Thiessen*, 267 F.3d at

1102-03.  When ruling the motion to decertify, "the [C]ourt then makes a second determination,

utilizing a stricter standard of 'similarly situated.'"  *Id.* at 1102-03.  "During this 'second stage'

analysis, a court reviews several factors, including[:]  '(1) disparate factual and employment

settings of the individual plaintiffs; (2) the various defenses available to defendant which appear

to be individual to each plaintiff; [and] (3) fairness and procedural considerations . . .'" (these are

commonly referred to as the "*Thiessen* factors").[3]  *Id.* at 1103 (quoting *Vaszlavik v. Storage*

*Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).

"If the claimants are indeed similarly situated, 'the district court allows the representative

action to proceed to trial'"; but if they are not, "'the district court decertifies the class, the opt-in

---

[3] *Thiessen* also includes a fourth factor—whether plaintiffs made the filings required by the
ADEA before instituting suit.  This factor does not apply to FLSA cases, however.  *See Green*, 888 F.
Supp. 2d at 1094 n.10.

plaintiffs are dismissed without prejudice,' and 'the class representatives—*i.e.*[,] the original

plaintiffs—proceed to trial on their individual claims.'" *Green v. Harbor Freight Tools USA,*

*Inc.*, 888 F. Supp. 2d 1088, 1094 (D. Kan. 2012) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d

1207, 1214 (5th Cir. 1995)).  "The decision whether to decertify a collective action is within the

district court's discretion. *Id.* (citing *Thiessen*, 267 F.3d at 1102).

Defendants here seek an order decertifying both of the conditionally-certified classes.

The Court addresses defendants' motion as it applies to each class separately.

### A.  Motion to Decertify the Deduction Class

The Court first addresses defendants' motion to decertify as it applies to the Deduction

Class.  In general, the FLSA requires employers to pay their employees overtime wages, at a rate

of one and one-half times their usual hourly wage, for hours worked in excess of forty hours per

week. *See* 29 U.S.C. § 207(a)(1).  But employees who are "employed in a bona fide executive,

administrative, or professional capacity"—as defined by the Secretary of Labor's regulations, *see*

§ 213(a)(1)—are exempt from these overtime pay requirements.  To qualify for one of these

exemptions, an employee must satisfy a "salary level" test, a "duties test," and a "salary-basis"

test. *See* 29 C.F.R. §§ 541.100, 541.200, 541.300.  The Deduction Class' claims assert that

DJE's compensation practices failed to satisfy the salary-basis requirement.

To meet the salary-basis test, a defendant bears the burden to establish that it paid its

employees:  "(1) a predetermined amount, which (2) was not subject to reductions (3) based on

quality or quantity of work performed." *Kaiser v. At The Beach, Inc*., No. 08-cv-586-TCK-

FHM, 2011 WL 6826577, at *14 (N.D. Okla. Dec. 28, 2011) (citing *Baden-Winterwood v. Life*

*Time Fitness, Inc.*, 566 F.3d 618, 625-26 (6th Cir. 2009)); *see also* 29 C.F.R. § 541.602.  The

Secretary of Labor's regulations provide guidance for determining whether an employee's salary

is subject to reduction and, hence, fails the salary-basis test. *See* 29 C.F.R. § 541.603 (quoted *infra* at p. 24).

Mr. Swartz asserts that he is similarly situated to other employees in the Deduction Class because DJE classified each of these class members as an exempt executive, administrative, or professional employee but engaged in compensation practices violating the salary-basis requirement for these exemptions. Mr. Swartz and all seven opt-in plaintiffs have joined this first conditionally-certified class. Defendants argue that each of the *Thiessen* factors favors decertifying the Deduction Class. *See* Doc. 84 at 7-13. The Court considers each of these factors below.

### 1. *Plaintiffs' Employment Settings*

Defendants first argue that the Court should decertify the Deduction Class because plaintiffs' employment settings differ. Defendants concede that the Project Engineers—Mr. Swartz, Mr. Ranjbar, and Mr. Nguyen—are "somewhat similarly situated" because they have similar job titles and responsibilities. Doc. 84 at 8 (listing shared job duties). Defendants contrast this employment setting with the ones occupied by: Mr. Riggins and Mr. Hall, sales and marketing personnel who researched potential customers and promoted DJE services; Mr. McDonald, the FAA accountable manger of the Repair Station, who wrote repair manuals, interacted with the FAA, and marketed repair station services; Mr. Clift, who planned manufacturing processes; and Mr. Mansouri, who oversaw DJE's efforts to build and, later, acquire a composites shop, and who served briefly as interim Quality Manager.

Plaintiffs argue that proof of the FLSA violation asserted by the Deduction Class does not depend on the similarities (or differences) of their job duties or classifications. The Court agrees. Regardless whether an employee is exempt under the executive, administrative, or professional

13

exemptions, DJE must pay that employee on a salary basis or lose the exemption.  *See* 29 C.F.R. § 541.100(a)(1) (salary-basis requirement for executive employees); 29 C.F.R. § 541.200(a)(1), (salary-basis requirement for administrative employees), 29 C.F.R. § 541.300(a)(1) (salary-basis requirement for professional employees).  Each of these exemptions incorporates an identical salary-basis requirement.  *See* 29 C.F.R. § 541.100(b), § 541.200(b), § 541.300(b) (incorporating salary-basis requirement set forth in 29 C.F.R. § 541.602).  Defendants' arguments about the plaintiffs' differing job classifications might matter if plaintiffs had asserted a different FLSA theory.  *See*, *e.g.*, *infra*, Part II((B)(1)-(2).  But where, as here, plaintiffs assert a single statutory violation that applies to all of the applicable exemptions, these differing job classifications do not defeat their status as similarly situated plaintiffs.  *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) (finding that "one situation where a group of employees is similarly situated" exists when plaintiffs allege "common theories of defendants' statutory violations").

### 2. *The Existence of Individualized Defenses*

Defendants next argue that the Court should decertify the Deduction Class because they will assert individualized defenses against the claims brought by each plaintiff.  Doc. 84 at 11.  Two of the "defenses" that defendants identify are the executive and professional exemptions described above.  Defendants' argument premised on these exemption defenses simply repeats an argument the Court has rejected already—*i.e.*, because the plaintiffs occupy different job classifications, the exemptions that apply to them also are different.  But, as the Court has explained, the Deduction Class alleges violations of the salary-basis rule common to each of the two exemptions.  These defenses do not raise issues on which plaintiffs are situated differently.

According to defendants, two other defenses apply individually to certain plaintiffs.

First, they assert that Mr. Hall and Mr. McDonald are exempt as "highly compensated employees" under 29 C.F.R. § 541.601.  This exemption, however, still requires that an employee be compensated "at least $455 per week paid on a *salary* or fee basis."  *Id.* at § 541.601(b)(1).  Defendants do not contend that DJE compensated either employee on a fee basis.  And while the exemption provides that "a high level of compensation is a strong indicator of an employee's exempt status," this presumption applies to a duties-test analysis only and thus does not matter to the Deduction Class' salary-basis claims.  *See id.* at § 541.601(c) ("[A] highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt *duties* or responsibilities of an executive, administrative or professional employee . . . .(emphasis added)); *Anani v. CVS RX Servs., Inc.*, 788 F. Supp. 2d 55, 60 (E.D.N.Y. 2011) *aff'd*, 730 F.3d 146 (2d Cir. 2013) (explaining, "while the highly compensated employee test may lower the burden for satisfying the duties test, it still requires that the [employees'] compensation, regardless of salary level, meet the requirements of the salary basis test").  Thus, the highly compensated employee exemption, if applicable here, hinges on the same salary-basis issue common to all plaintiffs in the Deduction Class.

Next, defendants say that they intend to argue that Mr. Riggins and Mr. Hall were exempt under the outside sales exemption set forth in 29 C.F.R. § 541.601.  This exemption applies if an employee:  (1) has a primary duty of making sales or "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer" and (2) is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  *Id.*  Significantly, the outside sales exemption does not require the employer to pay the employee on a salary basis.  *See id.*; *Burke v. Alta Colleges, Inc.*, No. 11-CV-02990-WYD-KLM, 2014 WL 2882807, at *2 n.4 (D. Colo. June 25, 2014) (noting

15

that "the outside sales exemption does not have a salary basis requirement"). This exemption's role, if any, would not turn on proof of the salary-basis violations common to the other Deduction Class members' claims.

As plaintiffs point out, though, it is not clear whether defendants can establish two of the necessary elements of this exemption. They have not shown that Mr. Riggins and Mr. Hall's primary duties were sales functions or that these employees "customarily and regularly" worked away from DJE's facility. To be sure, a jury might find that defendants satisfied these elements at trial. But if they did not, the success of Mr. Riggins' and Mr. Hall's claims, like those of the other plaintiffs, would hinge on the applicability of an exemption that does include a salary-basis requirement. The Court cannot conclude, then, that these "individual [defenses] would predominate at trial" simply because a separate defense might apply to one or two members of the Deduction Class. *See Thiessen*, 267 F.3d at 1101.

### 3. *Fairness and Procedural Factors*

Last, defendants argue that fairness and procedural considerations weigh against certification. But of the two arguments they make about these factors, the first simply reasserts their earlier argument that the "highly individualized defenses" available to some defenses favor decertification. Doc. 84 at 12. The Court finds this argument unpersuasive for the reasons already explained, above. *See supra,* Part III(A)(2). Defendants' second argument addresses the difficulty and inefficiency of determining individualized damages for each plaintiff. *Id.* The Court recognizes that some situations exist where the number of plaintiffs and individualized damages determinations can overwhelm common factual issues and thus warrant decertification. *See Scott v. Raudin McCormick, Inc.*, No. 08-4045-EFM, 2010 WL 5093650, at *4 (D. Kan. Dec. 8, 2010) (the need for individualized damages determinations for 1,500 opt-in plaintiffs

favored decertification).  But, here, there are only eight plaintiffs in the Deduction Class.  The need to make individualized damages determinations is not so burdensome that it outweighs the other factors favoring certification.  *See Jancich v. Stonegate Mortgage Corp.*, No. 11-2602-EFM, 2014 WL 1011480, at *4 (D. Kan. Mar. 17, 2014) (the number of individualized damages determinations for a 13-plaintiff FLSA class was "not so numerous to defeat the efficiency of trying the action as a collective class").

Other factors suggest that the Court can resolve the Deduction Class' claims efficiently as a collective action.  DJE's treatment of similarly situated employees is important evidence on the question whether the employer maintained an actual practice or policy of salary deductions.  *See* 29 CFR § 541.603(a).  It is more efficient to present this evidence in one trial than to present it several times over in separate trials for each plaintiff.  *Cf. Kaiser v. At The Beach, Inc.*, No. 08-CV-586-TCK-FHM, 2010 WL 5114729, at *8 (N.D. Okla. Dec. 9, 2010) (certification is appropriate when it can "'lower the costs to the plaintiffs through the pooling of resources'") (quoting *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 462 (C.D. Cal. 2010)).  Having concluded that each of the three *Thiessen* factors favors allowing the Deduction Class' claims to proceed as a collective action, the Court denies defendants' motion to decertify this class.

### B.  Motion to Decertify the Engineer Class

The Court next addresses defendants' motion to decertify as it applies to the Engineer Class.  The Engineer Class consists only of Mr. Swartz and one opt-in plaintiff, Mr. Ranjbar.  These plaintiffs assert that DJE misclassified them as exempt professional employees.  29 C.F.R. § 541.300.  Their theory primarily asserts that their assigned responsibilities failed to meet the duties test to qualify for the professional employee exemption.  *See id.*

To satisfy the duties test for the professional employee exemption, an employee's

17

primary duty must consist of the following two elements:  (1) work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction;" or (2) work "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor."  29 C.F.R. § 541.300(a)(2). Defendants argue that each one of the *Thiessen* factors favors decertifying the Engineer Class. Based on the discrepancies in the nature of work these employees performed and the individualized proof required to resolve the Engineer Class' claims, the Court concludes that decertification is appropriate for this class.

### 1.  *Plaintiffs' Employment Settings*

Although plaintiffs have presented evidence that Mr. Swartz and Mr. Ranjbar nominally occupied the same job classifications, the record suggests that they had different job assignments.  For example, DJE hired Mr. Ranjbar initially as a Quality Engineer.  His duties under this classification primarily included inspecting manufactured parts.  In 2011, Mr. Ranjbar asked his supervisor for more engineering assignments, so DJE reclassified him as a Project Engineer.  But even with this new job title Mr. Ranjbar continued to perform many of the same inspection duties while DJE searched for a replacement Quality Engineer.  Mr. Ranjbar testified at his deposition that there were periods, even as a Project Engineer, when he had just one job responsibility:  to inspect manufactured parts.  Mr. Ranjbar testified that he spent 60% of his time on inspection duties and 40% on his project engineering work.

Mr. Swartz, by contrast, worked as a Project Engineer throughout his employment.  His duties as a Project Engineer required him to review folders containing the specifications for parts and to formulate manufacturing plans.  He also was responsible for procuring all materials necessary for a particular job.  Mr. Swartz often used the CATIA system to create a model of the

requested part, and if the job required a specific tool for the manufacturing process, Mr. Swartz would build that tool.  The record establishes that these two plaintiffs' employment setting and theories of misclassifications share little.

### 2.  *The Existence of Individualized Defenses*

The defendants dispute the Engineer Class' claim that their work did not qualify as professional work.  To determine whether these plaintiffs' work assignment satisfied the duties test for the professional exemption, a fact-finder would need to determine, first, what job duties each plaintiff performed; second, which of those job duties qualified as professional work under § 541.300(a)(2); and third, whether the duties constituting professional work, if any, were the "primary" job duties of each employee.  *See id.*  Based on the different employment circumstances presented by Mr. Swartz and Mr. Ranjbar, these issues necessarily require a fact-finder to examine separate proof for each class member.  The Court thus concludes that this factor weighs in favor of decertification.

### 3.  *Fairness and Procedural Considerations*

Plaintiffs tacitly recognize that the case for certifying the Engineer Class is weak. Indeed, their principal argument favoring of certification is that the Court easily can manage what essentially are individualized claims because there are just two plaintiffs in this class.  *Id.* at 9.  The Court agrees.  Including the Engineer Class will not present significant case management problems.  Other factors, however, more strongly favor decertification.

First, 29 U.S.C. § 216(b), which authorizes FLSA collective actions, provides that such actions are available for "similarly situated" employees.  Because the Court has determined that Mr. Swartz and Mr. Ranjbar are not similarly situated, § 216(b) does not authorize them to proceed collectively.  *Cf. Thiessen*, 267 F.3d at 1103 (noting that three *Thiessen* factors are

guidance for the ultimate question whether plaintiffs are "similarly situated" under § 216(b)).

Second, because Mr. Swartz and Mr. Ranjbar occupy different employment settings, the

commonly cited "fairness and procedural" benefits—lower cost for plaintiffs by resource pooling

and resolution of common issues of law arising the same alleged activity, *see Kaiser*, 2010 WL

5114729, at *8—would not be achieved by certifying this class. Finally, in its analysis of the

Deduction Class, the Court found the plaintiffs' different employment settings are

inconsequential because their exemptions each contained a salary-basis requirement. To put it

another way, the Court found that common issues about the alleged violations of the salary-basis

requirement would predominate over issues relating to actual job duties performed. Injecting

into a trial the job-duties proof and analysis necessary to decide the Engineer Class' claims

would risk confusing the fact-finder about the distinct theories each class asserts. For these

reasons, the Court grants defendants' motion to decertify the Engineer Class.

When a district court decertifies an FLSA class, it must dismiss claims asserted by the

opt-in plaintiffs without prejudice and permit the class representative to proceed to trial on their

individual claims. *Kaiser*, 2010 WL 5114729, at *4 (citing *Mooney*, 54 F.3d at 1214). The

Court thus dismisses opt-in plaintiff Ramin Ranjbar's claim that his primary job duties failed the

duties test for an exempt professional without prejudice to his right to refile it individually.[4]

### IV.    Defendants' Motion for Summary Judgment

The Court now turns to defendants' motion for summary judgment. Defendants seek

summary judgment on the claims asserted by both classes. To prevail on a motion for summary

judgment, a moving party must demonstrate that there is "no genuine dispute as to any material

---

[4] The Court cautions Mr. Ranjbar that the statute of limitations for his individual claim, should he choose to file one, resumes on the date of this Order. *See Green*, 888 F. Supp. 2d at 1105 ("The statute of limitations for a plaintiff in a collective action is tolled after the plaintiff has filed a consent to opt in to the collective action, and begins to run again if the court later decertifies the collective action.").

fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the Court views the evidence and draws inferences that favor the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Thomas v. Wichita Coca-Cola Bottling*

21

*Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### A. Motion for Summary Judgment on the Deduction Class' Claims

Under the Secretary's regulations, an employee is paid on a "salary basis" if the employee "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). "'Since exempt employees are not paid by the hour, the FLSA's implementing regulations prohibit employers from docking their pay for working less than a full eight-hour day.'" *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1188 (10th Cir. 2015) (quoting *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 705 (10th Cir. 2012)).  Courts must construe FLSA exemptions "narrowly against employers," and the employer bears the burden of proving that an exemption applies. *Id.* (citing *Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999) (further citations omitted)).

In certain situations, however, "[a]n employer may lose the right to treat otherwise eligible employees as exempt . . . ." *Id.*  As plaintiffs allege here, "[a]n employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a).  "Whether an employer making such improper deductions should be deemed *not* to have intended to pay on a salary basis turns on whether the employer has an 'actual practice of making improper deductions,' as opposed to a 'theoretical possibility of such deductions.'" *Ellis*, 779 F.3d at 1188

(quoting *McBride*, 688 F.3d at 705 (internal citations omitted)).

Plaintiffs here assert two theories purporting to establish that DJE did not intend to pay the Deduction Class plaintiffs on a salary basis: (1) DJE maintained a clearly articulated policy that created a "significant likelihood" of improper salary deductions; and (2) DJE engaged in an "actual pattern or practice" of making improper salary deductions.

### 1. "Significant Likelihood" Claims

Plaintiffs' "significant likelihood" of improper deductions theory relies on the Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452 (1997). In that case, the Supreme Court adopted the Secretary of Labor's interpretation of a previous version of the FLSA regulations. The Secretary's interpretation provided that an employer violated the salary-basis test if it either: (1) engaged in an actual practice of salary deductions; *or* (2) maintained a policy that clearly communicated a "significant likelihood" of deductions. *Id.* at 461. The Court concludes that plaintiffs' "significant likelihood" theory fails because the second prong of *Auer* no longer state the governing law.

The Secretary of Labor's revised regulations, which took effect on August 23, 2004, expressly reinterpreted the salary-basis test. *See* 29 C.F.R. § 541.603. The revised regulations eliminate the "significant likelihood" test from *Auer* and, instead, require a plaintiff to prove that an employer engaged in an "actual practice of making improper deductions." *Id.*; *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122-01 (Apr. 23, 2014) (describing the Secretary's rationale for nullifying the "significant likelihood" test). Other courts have since acknowledged that the "significant likelihood" test no longer applies. *See*, *e.g.*, *Baden-Winterwood*, 566 F.3d at 628 (6th Cir. 2009) (explaining that the 2004 regulations eliminated the

"substantial likelihood" test and that courts must now apply the "actual practices" test); *Kaiser*, at *13 n.26 (adopting the Sixth Circuit's analysis). Because the Court agrees with the Sixth Circuit's analysis, it concludes that plaintiffs' "significant likelihood" theory fails as a matter of law. Given this conclusion, plaintiffs must adduce evidence from which a reasonable jury could conclude that DJE engaged in an "actual practice" of improper salary deductions.

### 2.  "Actual Practice" Claims

The Secretary of Labor has issued regulations establishing five non-exclusive factors courts should to consider when determining the existence of an actual practice of improper salary deductions:

> The factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. § 541.603(a). Under this subsection, "'if the facts demonstrate that' the employer maintained '[a]n actual practice of making improper deductions,' the default conclusion is that the employer '*shall* lose the exemption' . . . because its 'actual practice' of improperly deducting pay vitiates the intent to pay a salary under the salary-basis test." *Ellis*, 779 F.3d at 1189 (quoting 29 C.F.R. § 541.603(a) (emphasis added). "Consequently, when the facts so indicate, 'the exemption is lost during the time period in which the improper deductions were made.'" *Id.* (quoting 29 C.F.R. § 541.603(b) (further citations omitted)). Below, the Court considers these § 541.603(a) factors to determine whether the summary judgment record—viewed in the light most favorable to plaintiffs—presents a triable issue of fact about whether DJE engaged in an "actual practice" of improper salary deductions.

24

### a. *Number of Improper Deductions*

The first factor § 541.603(a) instructs courts to consider is the "number of improper deductions, particularly as compared to the number of employee infractions warranting discipline." The summary judgment record contains two categories of evidence on this factor.

After Mr. Swartz filed this lawsuit, DJE instructed its IT Department to conduct a payroll review. The review identified 173 occasions where salaried employees received less than full salary for a two-week pay period. After reviewing the absence reports associated with these deductions, Vice President Tuschhoff concluded that the deductions were proper for 13 of the employees because they occurred when the employee began or concluded his employment in the middle of a week. After excluding these employees, Mr. Tuschhoff identified 28 employees who had received what he called "questionable" deductions that deserved a closer look. Mr. Tuschhoff ultimately concluded that DJE improperly had reduced salary payments for 13 of the employees in the notice group.[5] DJE sent all 13 of these employees—except for Mr. Swartz—a reimbursement check for the time deducted. The total amount of salary reimbursed as a result of this review was $2,440.10.

Plaintiffs challenge the accuracy of defendants' payroll review, asserting that defendants failed to disclose the methods they used to identify deductions, identify employees eligible for reimbursement, and calculate reimbursement amounts. But plaintiffs do not identify the actual existence of any improper salary deductions that defendants' calculations failed to detect. Plaintiffs also argue that defendants' calculations, performed in November of 2011, could not have taken into account any partial deductions occurring after that date. But, again, they never

---

[5] Other than Mr. Swartz, the 13 employees are plaintiffs Mike Clift, Ramin Ranjbar, and non-parties Nicholas Lies, Mahmudunnabi Basunia, Ryan Hernandez, Nirupama Barua, Andrew Foster, Kenneth McKibben, Thomas A. Brewer, Mostafezur Rahman, Walton Koch, Craig Taylor.

demonstrate the actual existence of any such deductions.  If plaintiffs believe that they or other employees suffered more deductions than defendants' calculations located, it was their burden to identify facts to support this position.  *See Kannady*, 590 F.3d at 1169 (on summary judgment, once a movant has satisfied its initial burden of production, the burden shifts to the nonmovant to identify specific facts demonstrating a genuine and material issue for trial).  The Court thus accepts for summary judgment purposes defendants' assertion that 13 members of the deduction group suffered improper deductions due to absences of less than one day.

When determining the number of improper deductions, the Tenth Circuit has instructed courts to consider whether any of the deductions were isolated or inadvertent deductions covered by subsection (c) of § 541.603.  *See Ellis*, 779 F.3d at 1204.  Subsection (c) creates a savings provision for "[i]mproper deductions that are either isolated or inadvertent," allowing the exemption to stand "if the employer reimburses the employees for such improper deductions." *See Ellis*, 779 F.3d at 1189 (this provision is sometimes referred to as the "window of correction" defense).  To avail themselves of § 541.603(c)'s savings provision, defendants must establish that:  (1) the deductions made were either isolated or inadvertent; and (2) the employees affected by the deductions received reimbursement.  The parties do not dispute that all 13 of these employees, except for Mr. Swartz, received reimbursement.

The Tenth Circuit has instructed that a defendant may satisfy subsection (c) by a showing that the deductions were either isolated *or* inadvertent.  *See Ellis*, 779 F.3d at 1204 (interpreting 29 C.F.R. § 541.603(c) to permit the window of correction defense when deductions were isolated *or* inadvertent, notwithstanding other circuits' holdings that the defense is available only for inadvertent deductions).  Both standards seek to ascertain whether an employer "objectively intended" to pay an employee on a salary versus an hourly basis.  *Yourman v. Giuliani*, 229 F.3d

124, 130 (2d Cir. 2000); *see also Carpenter v. City & Cnty. of Denver*, 115 F.3d 765, 767 (10th

Cir. 1997); *Block v. City of Los Angeles*, 253 F.3d 410, 415 (9th Cir. 2001).

Applying our Circuit's criteria, the Court cannot conclude that the summary judgment

facts entitle defendants to determination as a matter of undisputed fact that the deductions were

"isolated" or "inadvertent."  While there is no magic number for subsection (c) purposes, "in

some cases, the number of [deductions] alone may be sufficient indicia of the employer's intent

to [allow the court to] resolve the 'actual practice' determination."  *Block*, 253 F.3d at 415 (citing

*Paresi v. City of Portland*, 182 F.3d 665, 668 (9th Cir.1999) (holding two improper suspensions

insufficient to constitute an "actual practice"); *Childers v. City of Eugene*, 120 F.3d 944, 949 (9th

Cir. 1997) (one suspension insufficient); *see also Carpenter*, 115 F.3d 765, 767 (10th Cir.1997)

(two suspensions insufficient)).  "In other cases, however, a number of factors may need to be

considered to resolve the question of the employer's objective intentions."  *Block,* 253 F.3d at

415 (holding that a pattern of 19 disciplinary suspensions without pay was sufficient to establish

an "actual practice") (citing *DiGiore v. Ryan*, 172 F.3d 454, 464 (7th Cir.1999) (five suspensions

made over several years and under unusual circumstances did not constitute an "actual

practice"); *Yourman*, 229 F.3d at 129-131 (remanding for district court to consider circumstances

surrounding twelve suspensions and noting Secretary of Labor's position that the "actual

practice" determination is usually a factual inquiry "best left to the trial court")).

Viewing the admissible evidence in the light most favorable to the plaintiffs, the Court

concludes that the deductions were sufficiently numerous for a rational jury to conclude that the

deductions were not isolated ones.  Likewise, the summary judgment record contains sufficient

facts to permit a finding that the deductions were not inadvertent.  Significantly, Mr. Tuschhoff

and Mr. Chowdhury, the individuals responsible for deciding deductions for DJE, testified that

27

they had believed it was proper for the company to deduct salary from exempt employees for absences last less than one full day.  A reasonable jury could conclude, then, that DJE took salary deductions in accordance with their belief, and, therefore, the deductions were not "inadvertent" ones.  Plaintiffs' depositions and declarations also state that the company maintained an expectation, even if informally, that the employees must work 50 hours a week or else DJE would reduce their salary payments.  Finally, DJE did not have an employee handbook, a supervisor or manager's manual, a written pay plan, or any statement guiding when it would take deductions from an employee's salary.  As a result, it is difficult for the Court to determine what sort of rules DJE applied when it deducted pay from salaried employees.  Because this issue arises on defendants' summary judgment motion, the Court resolves this gap in the evidence against defendants.

Two additional factors would permit a reasonable jury to find that the deductions were more frequent than defendants' calculations suggest.  First, defendants attempt to neutralize some deductions by explaining that they occurred when a pay period encompassed a holiday for employees who had not yet eligible for holiday pay.  DJE requires that employees complete 60-days of employment before they become eligible for holiday pay.  This requirement was one of the few written deduction policies DJE maintained in writing, and each employee's written offer of employment contained it.

As plaintiffs have argued, if the company closed on the particular holiday causing the deduction, this requirement would be inconsistent with the salary-basis rule.  *See* 29 C.F.R. § 541.602(a); *see also* Opinion Letter Fair Labor Standards Act (FLSA), 1999 WL 1002408, at *2 (opining that "an employee will not be considered to be 'on a salary basis' if deductions from his/her predetermined compensation are made for absences occasioned by the employer (*e.g.*,

28

closed on certain holidays)" (parenthetical in original)) (cited with approval in *In re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1187 (10th Cir. 2005)).  Although it is not clear whether DJE closed on all of the holidays at issue—and thus the absences qualified as ones "occasioned by the employer"—the summary judgment record establishes that DJE closed on at least some of the holidays.  *See* Doc. 82 at ¶ 47 (stating that DJE offices were closed on Wednesday, July 4, 2012 for Independence Day).  By the Court's count, three employees—Mr. Nguyen, Mr. McDonald, and Mr. Hall (twice)—experienced deductions because of this policy.  Doc. 82 at ¶¶ 46, 98, 159. A reasonable fact finder could conclude that the existence of this policy increased the number of improper salary deductions.  It also could support a permissible inference that DJE did not intend to pay its employees on a salary basis.  *See Takacs v. Hahn Auto. Corp.*, 246 F.3d 776, 782 (6th Cir. 2001) ("The [window of correction defense] should not be read to allow an employer to obtain the statutory overtime exemption where, as here, that employer has engaged in an actual practice of making impermissible deductions from pay pursuant to an established policy.").  In sum, the summary judgment record, when viewed in the light most favorable to plaintiffs, supports a finding that the "number of deductions" factor favors the conclusion that DJE engaged in an actual practice of improperly salary deductions.

### b.  *Time Period During Which the Employer Made Improper Deductions*

The second factor in § 541.603(a) asks the Court to consider the time period during which DJE made improper deductions.  The summary judgment record contains evidence of deductions due to holidays occurring before an employee satisfied his 60-day tenure throughout the class period.  Deductions due to absences of less than one full day, however, appear to have stopped in the Fall of 2011, after defendants' counsel advised them that such deductions were not proper for salaried employees.  Nothing about the timing of the deductions would negate a

finding that DJE took deductions pursuant to an actual policy or practice. To the contrary, that the deductions appear to have stopped after an informal policy revision could support an inference that DJE took the previous deductions pursuant to an actual policy or practice. The Court thus concludes that this factor also favors denying summary judgment

### c. *Number and Geographic Location of Employees Whose Salary was Improperly Reduced, and Number and Geographic Location of Managers Responsible for Taking the Improper Deductions*

The third and fourth factors in § 541.603(a) instruct the Court to consider the geographic location of the managers responsible for taking the deductions and geographic location of the affected employees. The personnel responsible for making deductions, Mr. Chowdhury and Mr. Tuschhoff, both worked in DJE's Augusta, Kansas location. So did all of the plaintiffs and non-party employees who experienced deductions. The fact that each plaintiff worked at the same location and was subject to the decisions of the same payroll managers make it more likely that the deductions they experienced were attributable to the same practice or policy. This factor favors denying defendants' motion for summary judgment.

### d. *Whether the Employer Has a Clearly Communicated Policy Permitting or Prohibiting Improper Deduction*

Defendants have identified no "clearly communicated policy" that prohibits improper salary deductions. To the contrary, the only written policy about deductions in the summary judgment record addressed eligibility for holiday pay, and, as the Court has explained, it likely violated the salary-basis rule. DJE had no written policy about any other type of deduction. It had no employee handbook, supervisor or manager's manual, or any other written pay plan or statement explaining when it would deduct salary. In addition, plaintiffs' declarations and depositions suggest that the policy DJE communicated to them, whatever it was, led them to believe that their salaries were subject to reductions if they failed to work 100 hours in a pay

period.  *See* Pls.' Exs. 20 (Doc. 102-22 at ¶¶ 2, 4), 21 (Doc. 102-23 at ¶¶ 2, 4), 22 (Doc. 102-25 at ¶¶ 2, 4).  The Court must accredit this testimony for summary judgment purposes.

In sum, the Court concludes that a genuine issue of material fact exists whether DJE maintained an actual policy of taking deductions from the salaries of exempt employees for failing to work sufficient hours in a pay period.  It also concludes there is sufficient evidence for a jury to find that DJE improperly reduced new salaried employees' pay for absences occasioned by DJE.  Accordingly, the Court denies defendants' motion for summary judgment on the salary-basis claims asserted by the Deduction Class.

### 3.   Scope of Plaintiffs' Actual Practice Claim

Having concluded that triable issues of fact exist whether defendants maintained an actual practice of improper salary deductions, the Court next must decide which plaintiffs were subject to that practice.  According to defendants' payroll review, only three of the 13 employees who suffered deductions due to absences of less than one day are plaintiffs in this case:  Mr. Clift, Mr. Ranjbar, and Mr. Swartz.  Three more employees experienced deductions due to DJE's holiday-pay eligibility policy:  Mr. Nguyen, Mr. McDonald, and Mr. Hall.  This means that two plaintiffs, Mr. Riggins and Mr. Mansouri, never experienced any deductions during the class period.[6]  But the Court declines to dismiss these plaintiffs at the summary judgment stage, for two reasons.

First, the regulations are clear.  When an employee establishes a violation of salary basis, the exemption is lost "during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions."  29 C.F.R. § 541.603(b).  Plaintiffs have identified admissible

---

[6] Mr. Riggins testified that he experienced no deductions and Mr. Mansouri testified that he "could not recall" any deductions.

evidence indicating that all of them were subject to the payroll decisions made by Mr.

Chowdhury and Mr. Tuschhoff.  And the summary judgment facts do not resolve whether Mr.

Riggins or Mr. Mansouri shared a job classification with at least one other plaintiff who

experienced actual deductions.

Second, courts have reached different conclusions about whether, in light of the 2004

revisions to the FLSA regulations, a plaintiff who has received no salary deductions can

nevertheless establish that he was "subject to" a practice of salary deductions.  *Compare*

*Kennedy*, 410 F.3d at 371 (noting that although "[t]he plaintiffs' wages have never been

decreased under this policy, but both the old and new regulations state that being 'subject to' a

reduction in pay is sufficient to prevent an employee from being considered 'salaried'") *with*

*Monroe Firefighters Ass'n v. City of Monroe*, 600 F. Supp.2d 790, 798-99 (W.D. La. 2009)

(holding that "[t]o the extent that the post-August 23, 2004 regulations require an actual

disciplinary deduction and to the extent that these regulations are controlling, there is no

evidence that any [employee] ever suffered a twelve-hour deduction from pay for missing out.");

*see also Kaiser*, 2010 WL 5114729, at *15 n.29 (discussing split authority).  Neither party

briefed this important issue—possibly a dispositive question for these two plaintiffs—so the

Court declines to resolve it here.  *See Port-a-Pour, Inc. v. Peak Innovations, Inc.*, No. 13-CV-

01511-WYD-NYW, 2015 WL 558702, at *8 (D. Colo. Feb. 10, 2015) (reserving for trial

resolution of an issue not adequately briefed for summary judgment).  For these reasons, the

Court declines to grant summary judgment against the claims asserted by Mr. Riggins and Mr.

Mansouri.

### B.  Motion for Summary Judgment on the Engineering Class Members' Claims

Defendants also seek summary judgment on the misclassification claims asserted by the

Engineering Class.  But, having granted defendants' motion to decertify the Engineer Class and

dismissed the opt-in plaintiff, the Court need only resolve defendants' motion as it applies to Mr. Swartz' misclassification claim. To do so, the Court must determine whether there is a genuine issue of material fact whether Mr. Swartz primarily performed exempt professional work.

### 1.   Whether Mr. Swartz Performed Exempt-Professional Work

Under 29 C.F.R. § 541.300(a), "[t]he term 'employee employed in a bona fide professional capacity'" means any employee:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging, or other facilities; and

(2) Whose primary duty is the performance of work:

    (i)   Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or

    (ii)  Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

Defendants argue that Mr. Swartz satisfies the first prong of the duty-test because he meets the definition of a "learned professional"—*i.e.*, his "primary duty [encompasses] the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(2)(i). The primary duty test for learned professionals includes three elements: "(1) [t]he employee must perform work requiring advanced knowledge; (2) [t]he advanced knowledge must be in a field of science or learning; and (3) [t]he advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." *Id.* According to the Secretary's regulations, "work requiring advanced knowledge" refers to "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or

physical work." *Id.* at § 541.301(b).  Further, a "field of science or learning" includes the "traditional profession[]" of "*engineering*." *Id.* at § 541.301(c) (emphasis added).

Mr. Swartz claims that DJE misclassified him as an exempt professional because the work he performed, in his words, was "not overly difficult," and someone "hired off the street [and] taught to do it" could perform it "pretty readily."  Doc. 102 at 35.  He furthered testified that a person hired off the street would not need to have an engineering degree to perform the functions, although, he concedes, it would be "helpful to know CATIA," and a "lot of it is taught on the job." *Id.*  Mr. Swartz also asserts he did not rely on anything he learned while earning a mechanical engineering degree at Wichita State University.  Last, he claims that one of the duties he performed regularly—ordering parts and hardware—just required him to follow a simple parts list.

Defendants contend that the summary judgment record establishes that Mr. Swartz' primary duties were, in fact, those of a degreed engineer.  Mr. Swartz held a mechanical engineering degree and had worked in engineering roles at other firms for four years before he began his employment at DJE.  The summary judgment facts establish that Mr. Swartz' job required him first to review a customer's specifications.  In most instances, an engineer who worked for the customer provided this information.  Next, he would create a production plan, and procure the necessary materials and hardware.  If the customer made changes during the course of the project, Mr. Swartz would update the job order with the approved changes.  Sometimes it was necessary for Mr. Swartz to use the CATIA software to create a model of the requested part or to build a tool to use during manufacturing process.  After Mr. Swartz had completed those steps, he would send the project to the manufacturing shop.  During the manufacturing process, if there were questions or concerns about the part, Mr. Swartz was responsible for providing

34

engineering support.  Also, he occasionally communicated directly with customers who had engineering questions.  Mr. Swartz worked with manufacturing and production employees to identify lessons learned about the projects, so DJE could avoid the same problems in the future. Mr. Swartz testified that he spent the "majority" of his time doing project planning and providing engineering support to the shop.

The summary judgment facts establish that Mr. Swartz' project planning and engineering support duties consisted of professional engineering work.  *Pinillia v. Northwings Accessories Corp.*, No. 07-21564-CIV, 2007 WL 3378532, at *8-9 (S.D. Fla. Nov. 13, 2007) (granting summary judgment for employer, concluding that job duties of engineer who designed specialized tools, provided manufacturing specifications, and worked with computer aided design software qualified as a professional engineering duties).  This conclusion leaves only one question: whether these duties constituted his "primary duties"

## 2.  Whether Mr. Swartz' Exempt Work was his "Primary Duty"

The Secretary's regulations define "primary duty" as follows:

> To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work.  The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole . . . .

29 C.F.R. § 541.700(a).  This regulation also instructs courts to consider the following factors to determine whether certain job duties constituted an employee's "primary duty":  (1) "the relative importance of the exempt duties as compared with other types of duties;" (2) "the amount of time spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and" (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

These factors, applied to the summary judgment facts, will support just one finding:  Mr.

Swartz' professional engineering duties were his primary duties.  The exempt duties for the Project Engineers were more important than the nonexempt ones.  Nearly all of the job duties contained DJE's official Project Engineer job description are exempt duties.  Mr. Swartz also enjoyed considerable freedom from direct supervision.  He testified that DJE authorized him to approve his own project planning and procure materials without direct supervision.  Finally, Mr. Swartz testified that he knew of no hourly-compensated employees who were performing the type of duties he performed.

The Secretary's regulations also provide that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b).  Here, Mr. Swartz testified that he devoted the "majority" of his work time to project planning and engineering support duties.  He thus qualifies a "presumptively exempt" employee.  *See Kanatzer v. Dolgencorp, Inc.*, No. 4:09CV74 CDP, 2010 WL 2720788, at *3 (E.D. Mo. July 8, 2010).  Mr. Swartz has come forward with no evidence that could successfully rebut his presumptively exempt status.  To the contrary, the record evidence only bolsters the conclusion that Mr. Swartz' primary duties consisted of professional engineering work.  Although Mr. Swartz claims repeatedly that anyone could perform his job, the Court need not credit Mr. Swartz conclusory assertions as facts.  *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (observing that "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings . . . . [E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").  The Court has examined the record as a whole, including the facts conveyed by Mr. Swartz' testimony, and concludes that defendants are entitled to summary judgment on his misclassification claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for an Order to Decertify Collective Action (Doc. 84) is granted in part and denied in part.  The portion of defendants' motion seeking to decertify the Deduction Class is denied.  The portion of defendants' motion seeking to decertify the Engineer Class is granted.  Opt-in plaintiff Ramin Ranjbar's claim alleging that DJE misclassified him as an exempt professional is dismissed without prejudice.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 84) is granted in part and denied in part.  The portion of defendants' motion seeking summary judgment on plaintiffs' claims alleging improper salary deductions is denied.  The portion of defendants' motion summary judgment on plaintiff Jonathan Swartz' claim alleging that he was misclassified as an exempt professional is granted.

**IT IS SO ORDERED.**

**Dated this 9th day of July, 2015, in Topeka, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**